# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) |
| | )    Chapter 11 |
| Morris \| Schneider \| Wittstadt Va., PLLC, a | ) |
| Virginia professional limited liability | )    Case No. 15-33370 |
| company, et al., | ) |
| | )    (Joint Administration Pending) |
| Debtors.[1] | ) |

## DECLARATION OF MARK WITTSTADT, EXECUTIVE MANAGING PARTNER OF MORRIS \| SCHNEIDER \| WITTSTADT, LLC, IN SUPPORT OF FIRST DAY MOTIONS

I, Mark Wittstadt, Esquire, hereby declare under penalty of perjury:

1.      I am the Executive Managing Partner of Morris | Schneider | Wittstadt, LLC ("MSW"), a law firm.  I am also a shareholder of MSWLAW, Inc. ("MSWLAW"), which is the sole member of Morris | Schneider | Wittstadt Va., PLLC, a Virginia professional limited liability company, and Morris | Schneider | Wittstadt, PLLC, a West Virginia professional limited liability company.  Further, I own a 50% membership interest in the following companies: (i) Teays Valley Trustees, LLC, a West Virginia LLC and (ii) Wittstadt Title & Escrow Company, L.L.C., a Virginia LLC.  Additionally, I own a 25% membership in York Trustee Services, LLC, a Tennessee limited liability company.

2.      I have been an attorney practicing at MSW since joining the firm in or about February 2008, and have been the Executive Managing Partner of MSW since on or about August 18 2014. In my capacity as Executive Managing Partner, I am personally familiar with the day-to-day operations, financial condition, business affairs, corporate history, and books and

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Morris | Schneider | Wittstadt Va., PLLC (1651), Morris | Schneider | Wittstadt, PLLC (1589), Wittstadt Title & Escrow Company, L.L.C. (3831), Morris | Schneider | Wittstadt, LLC (1589), MSWLAW, Inc. (6994), Teays Valley Trustees, LLC (9830), and York Trustee Services, LLC (8058).

records or the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

Except as otherwise indicated, all facts set forth in this Declaration are based on my personal

knowledge, my discussions with the Debtors' employees, my review of relevant documents, or

my opinion based on my experience, knowledge, and information concerning the Debtors'

operations and financial condition.

       3.     On today's date (the "Petition Date"), each of the Debtors filed a voluntary

petition with this Court for relief under the under Chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code"). I submit this Declaration to describe the Debtors' background, the

circumstances that led to the Debtors' chapter 11 filings, and the Debtors' goals in these cases. I

also submit this Declaration in support of relief the Debtors have requested in "first day"

applications and motions filed with the Court (collectively, the "First Day Pleadings"). The relief

sought in the First Day Pleadings is intended to help assist the Debtors to continue to operate

effectively, minimize potential adverse effects of filing bankruptcy, and ease the administrative

burden of operating in chapter 11. I am familiar with each of the First Day Pleadings, and I

believe that the Debtors would suffer immediate and irreparable harm, absent the ability to

continue their business operations as sought by the First Day Pleadings.

       4.     I am authorized to submit this Declaration on behalf of the Debtors, and submit

this Declaration in support of the petitions of the Debtors for relief and to provide the Court and

other interested parties with an understanding as to the facts and circumstances giving rise to the

commencement of these chapter 11 cases.  If called to testify, I could and would testify

competently to the facts set forth in this Declaration.

       5.     **Part I** of this Declaration provides a description of the Debtors' businesses,

organizational structure, and prepetition indebtedness. **Part II** describes the facts that led to these

chapter 11 cases and the Debtors' goals and intentions in these cases. **Part III** summarizes the

First Day Pleadings and explains why the relief requested is appropriate and necessary.

## I.   BACKGROUND

6.      When my brother, Gerard Wm. Wittstadt, Jr. ("Rod Wittstadt"), and I joined the

firm in or about February 2008, the firm was named Morris |   Hardwick | Schneider, LLC

("MHS").   At the time, it was managed by three partners, Arthur Morris ("Mr. Morris"),

Randolph Schneider ("Mr. Schneider"), and Nathan Hardwick, IV ("Mr. Hardwick").   At the

time, the firm had approximately 30 offices in 3 or 4 different states, and LandCastle Title, LLC

(a wholly owned subsidiary of MHSLAW that operated in an additional 4 states).   The primary

office of the firm at that time was in Atlanta, Georgia, and the centralized accounting department

was located in Atlanta, Georgia.

7.      In February 2008, the firm concentrated its practice in real estate closings.   Rod

Wittstadt and I practiced (and still practice) in Baltimore, Maryland and our practice focused

primarily on real estate foreclosures with some spill over into real estate closings.   In February of

2008 our firm, Wittstadt & Wittstadt, PA (W&W) entered into an asset purchase agreement with

Morris| Hardwick| Schneider, LLC wherein substantially all the assets of W&W were acquired

by MHS and Rod and I became employees at MHS.

8.      Beginning in late 2011, Messrs. Morris and Schneider were thinking of retiring

and began working on an agreement with the firm to retire.   At the time, Rod Wittstadt and I

were the practice leaders for the foreclosure practice of the firm and Mr. Hardwick and Mr.

Schneider were the practice leaders for the firm's real estate closing practice. Mr. Morris was the

senior partner of the firm. On June 1, 2013, Rod Wittstadt and I became equity partners at Morris

| Hardwick | Schneider, LLC and Messr. Morris and Schneider both retired. Up until June 1, 2013, Rod Wittstadt and I had no legal equity position in the firm.

### A.    The Debtors' Structure

9.    As noted above, MSWLAW is a holding company, which serves as the sole member of MSW, Morris | Schneider |Wittstadt Va., PLLC, a Virginia professional limited liability company, and Morris | Schneider | Wittstadt, PLLC, a West Virginia professional limited liability company. MSWLAW also has a 25% membership interest in York Trustee Services, LLC, a Tennessee limited liability company ("York").[2]  The remaining two debtor entities are Teays Valley Trustees, LLC, a West Virginia LLC ("Teays") and Wittstadt Title & Escrow Company, L.L.C., a Virginia LLC ("Wittstadt Title & Escrow").  Rod Wittstadt and I each own a 50% interest in each of these companies.

10.    Other than MSWLAW, all of the Debtors are involved in or related to the practice of law.  MSW is the chief operating entity, and Morris | Schneider |Wittstadt Va., PLLC, a Virginia professional limited liability company, and Morris | Schneider | Wittstadt, PLLC, a West Virginia professional limited liability company, are entities which were created for the practice in the Commonwealth of Virginia and state of West Virginia, each of which requires that an entity be organized in the state in order to have a law office.  York, Teays and Wittstadt Title & Escrow are all substitute trustees in mortgage foreclosure matters that are non-judicial in nature under the laws of the states in which they operate.

---

[2]    Barry King, Rod Wittstadt and I each own the remaining 25% membership interest.

B.      **The Debtors' Assets and Obligations**

i.      <u>**The Debtors' Assets**</u>

11.      Like most law firms, the Debtors' primary assets are employees.  At their peak, the Debtors employed over 850 people.  As of July 2, 2015, the Debtors were reduced to 128 employees, including 33 attorneys and 95 staff members.  In the weeks immediately prior to the bankruptcy filing, the overwhelming majority of the attorneys and staff announced that that they were voluntarily leaving for other jobs, effective July 2, 2015.  As of the Petition Date, the Debtors have 36 employees including 5 attorneys and 31 staff members.

12.      On the Petition Date, the Debtors were actively utilizing thirteen (13) bank accounts (collectively, the "<u>Accounts</u>") at five (5) banks and financial institutions (collectively, the "<u>Banks</u>").  Many of the bank accounts are inactive trust accounts and are the subject of an extensive audit being conducted by Fidelity National Financial (FNF) as part of their contribution agreement in LandCastle Title, LLC.  As discussed below, FNF publicly assured and agreed to cover all shortfalls in either the firm's or LandCastle's trust accounts in exchange for the majority interest in LandCastle.  As a result, numerous trust accounts are the subject of extensive auditing, funding and reconciliation.  Of the thirteen Accounts currently in use, eight are trust accounts (each, a "<u>Trust Account</u>")[3] holding funds of third parties in connection with the Debtors' business as counsel in real estate closings and foreclosure.  Other than approximately $1.45 million that is the subject of a dispute with the assignee for the estate of Butler & Hosch,

---

[3]      "Trust Accounts" include Interest on Lawyer Trust Account (IOLTA) accounts

P.A. and its secured lender, Amegy Bank, which is more fully discussed below, the Debtors have no financial interest in any of the funds held in the trust accounts; they are funds of third parties.[4]

13.    The funds held within the Trust Accounts are property that is maintained by the Debtor for the benefit or on account of their clients. Each Trust Account, and the funds therein, is segregated from the Debtors' other Bank Accounts and funds at all times, and not commingled. All Trust Accounts and/or funds otherwise held in trust will, at the client's request, either (i) be returned to the party for whom such funds were being held, (ii) transferred to the trust account for the law firm where the now-former MWS attorney took on the client matter corresponding to such funds; or (iii) applied to the respective invoices on account of which the Debtors performed services to the client in the course of business.

14.    The remaining five of the Accounts are each operating accounts.    As of the Petition Date, the Debtors had a total of approximately $500,000 in their operating accounts.

15.    The Debtors still have claim to significant accounts receivable, the largest of which is an obligation by CitiMortgage Inc. ("CitiMortgage") in the amount of approximately $600,000 which CitiMortgage set off against a purported claim by CitiMortgage against MSW. MSW has made demand upon CitiMortgage for the return of its funds, but CitiMortgage has steadfastly refused despite MSW's notification to CitiMortgage that MSW's secured lender, Action Capital, had a first position security interest in the payment due on the invoices.

---

[4]    The Assignee and B&H's secured creditor, Amegy Bank, have asserted that the funds are property of the B&H estate and subject to Amegy Bank's security interest.  The Debtors believe that neither B&H nor Amegy Bank have an interest.  The Debtors are holding the contested funds in one of their Trust Accounts at Liberty Bank pending either settlement or judicial resolution of the ownership of those funds.

ii.    **The Debtors' Secured Debt**

16.    As of the Petition Date, the Debtors have only three secured creditors:  The first two, Dunwoody Accounting Storage ("Dunwoody") and Northridge Pavilion III & IV, LLC ("Northridge"), are both landlords which have certain files in their possession and have refused to turn them over without payment of the amounts due. Dunwoody Accounting Storage is the owner of the storage unit where certain files are being held, and it has given notice to the Debtor that the contents of the storage unit will auctioned on July 16, 2015, unless the outstanding amount of $925.40 is paid.  FNF has informed the Debtors that it will pay the outstanding amount due to Dunwoody Accounting Storage. Northridge is owed approximately $15,453.33 in back rent, and informed the Debtors that it is claiming a Landlord's lien on all personal property located on the premises.  Northridge is in possession of certain computers with electronic client files and physical files that it will not tender, absent payment.

17.    Aside from certain landlords which claim an interest in certain files, the Debtors' only known secured creditor is Action Capital Corporation ("Action Capital"), which is owed approximately $175,000.  Action Capital served as a factor for MSW.  Specifically, Action Capital was the factor for certain invoices by CitiMortgage (and others) which owes MSW approximately $600,000.  As noted hereinabove, between January 20, 2015 and February 5, 2015 CitiMortgage offset - without MSW's consent - its obligations to MSW for legal work performed.  MSW contests both CitiMortgage's claims of malpractice and its offset of valid invoices.

18.    On January 24, 2011, Action Capital filed a UCC-1 with the Clerk of Superior Court, Fulton Georgia by which it asserted a security interest in all of MSW's acquired accounts, accounts receivable, contract rights, chattel paper, documents, instruments, inventory, general

intangibles, reserves, reserve accounts, rebates and all books and record pertaining to the foregoing and all proceeds therefrom. MSW has been timely remitting payment to Action Capital and upon information and belief, its account with Action Capital is in good standing. MSW does not believe that Action Capital's has any security interest in the Debtors' deposit accounts, and that Action Capital's collateral is limited to the obligations owed by CitiMortgage (and others) to the Debtors.

19.     Notwithstanding their belief that Action Capital is not secured by the cash in its deposit accounts, the Debtors do not at this time intend to use cash collateral without first attempting to see if there is an issue, and if so, to negotiate a resolution. Accordingly, the Debtors intend to segregate $175,000 from cash in their operating account, while it attempts resolve any issues with Action Capital.

### iii.     The Debtors' Unsecured Debt

20.     In addition to the Debtors' secured creditors, the Debtors have unsecured creditors with claims that aggregate more than $17 mil., not including rejection damages. Included among these unsecured obligations are two claims for money borrowed by Mr. Hardwick, for which Mr. Hardwick allegedly provided a guaranty by MSW without any authority. Those claims by James Prichard and Dustin Johnson which total $6.6 mil., including interest, are pending in the Fulton County Superior Court and United States District Court for the Northern District of Georgia, respectively. Additionally, there is one large claim for as much as $4.4 mil. by Branch Banking and Trust Company for malpractice against the firm caused by a former attorney. That claim is pending in the Fulton County Superior Court.

21.     The firm also owes Mr. Morris approximately $1.6 mil. for an unsecured loan made to the Debtors and 1.3 mil.to FNF for an unsecured loan made to Mr. Hardwick, but

assumed by the firm in connection with the defalcation by Mr. Hardwick  The majority of the remaining claims are from landlords, utilities, employee claims, and trade debt.  Significantly, many of the claims for trade debt are not obligations of any of the Debtors.    Following the transaction with Butler & Hosch, P.A. which closed on January 31, 2015. The Debtors anticipate that a number of trade vendors will assert claims against one or more of the Debtors for claims that that arose on or after February 1, 2015, and are therefore properly claims against the estate of Butler & Hosch, P.A.  Because the Debtors have received invoices from those trade vendors, the Debtors anticipate that the post-February 1, 2015, claims of those trade vendors will be included as disputed claims in the Debtors' schedules.

## II.    EVENTS LEADING TO COMMENCEMENT OF THE CASES

### A.    Nathaniel Hardwick's "Over Disbursements" and Their Direct and Proximate Effects

22.    On or about July 29, 2014, Mr. Hardwick sent my brother and I an email entitled "emergency call", asking for a call immediately. During the call Mr. Hardwick notified us that just prior to his leaving the United States for a trip abroad on July 17, 2014 he was made aware there was an issue with respect to financial irregularities with the firm's trust accounts. He informed us that an altered bank statement was found during a routine audit by Fidelity National Title Insurance Company, and that the chief financial officer had falsified the bank statement. When asked, the chief financial officer stated that she had inadvertently moved approximately $670,000 from the trust account to the operating account.

23.    Between July 31, 2014 and August 1, 2014, Mr. Hardwick informed Rod Wittstadt and myself that he may have been "over disbursed" and wired back to the firm $1.4 mil. Mr. Hardwick also advised that he would be seeking two personal loans in the amount of $2

mil. and $3 mil. to cover any "over disbursements" he may have received.  I directed Mr. Hardwick in no uncertain terms that, if he were to borrow any money, he had to do so personally, and not encumber any firm asset nor pledge the firm's guarantee. Mr. Hardwick represented that he had sufficient equity in his personal holdings to cover the loans he was going to obtain.

24.    While the investigation continued, Mr. Hardwick advised that he was able to obtain a 2 million dollar loan and was almost sure that he had obtained the 3 million dollar loan. On August 4, 2015, Mr. Hardwick advised that he had in fact obtained the 2 million dollar loan and he would wire the money to the firm on Tuesday August 5, 2014. On either August 4 or 5, 2014, Mr. Hardwick advised that he had secured the second loan and he would wire the funds on August 6, 2014. On August 5, 2014, Mr. Hardwick advised he had in fact wired 2 million to the firm, and on August 6, 2014, he again advised he had wired 3 million to the firm. The loan proceeds were wired directly to the account established as instructed by Mr. Smith.

25.    On Sunday, August 17, 2014, my brother and myself, being members of the board of directors of MHSLAW meet without Mr. Hardwick present and agreed that Mr. Hardwick would be suspended without pay from the firm effective immediately, and Mr. Hardwick was so notified. I further instructed the IT director to disable Mr. Hardwick's access to any and all of the firm's systems and property.  On August 18, 2014, Mr. Hardwick resigned his position with the firm.

26.    The audits conducted by FNTIC revealed that Mr. Hardwick, then a manager of MHS and the majority shareholder of MSWLAW, directly or indirectly caused that the firm to "over disburse" to Mr. Hardwick more than $20,000,000 from the firm's escrow accounts for his

personal use (including payments remitted directly to casinos and on account of private jets for the personal use of Mr. Hardwick, his girlfriend and family).

27.    Mr. Hardwick's "over disbursement" directly and proximately created a confluence of issues.  First and foremost, withdrawal of trust funds justifiably caused title companies and banks from whom the overwhelming majority of the Debtors' work originated to cease to provide new matters to MSW.  Moreover, the title companies and banks each withdrew active files from MSW.

28.    Second, immediately after the Rod Wittstadt and I learned of the "over disbursement," Mr. Hardwick pledged that he would personally return the money to the firm. Mr. Hardwick represented that the amounts of his "over disbursements" did not exceed $6.5 mil. Notwithstanding that the express direction that Mr. Hardwick was not authorized to borrow the money necessary to repay the "over disbursement" by pledging firm assets, Mr. Hardwick did just that.  On August 4, 2014, Mr. Hardwick, through his personal company, Divot Holdings, LLC ("Divot"), borrowed $2 mil. from James Prichard ("Mr. Prichard") at a rate of 15%. Further, Mr. Hardwick allegedly caused MSW to guarantee the Prichard loan.  On August 6, 2014, Mr. Hardwick also allegedly borrowed $3 mil. from Dustin Johnson ("Mr. Johnson") at a rate of 12% and allegedly had MSW guarantee the loan.  The alleged "guarantees" were not known to either of the Wittstadts until after Mr. Hardwick resigned his position with the companies and MSW was presented with demands for payment on account of these so-called loans.

29.    As a result of Mr. Hardwick allegedly causing MSW to guarantee the loans from Mr. Prichard and Mr. Johnson, MSW is now the subject of separate lawsuits by Mr. Prichard and Mr. Johnson.  The action by Mr. Prichard against MSW, Mr. Hardwick, and Divot is pending in

the Superior Court of Fulton County, State of Georgia (Civil Action No. 2014-CV-25435) (the "Pritchard Litigation").  On June 10, 2015, the Fulton County Superior Court entered an order and judgment on Mr. Prichard's motion for partial summary judgment solely as to defendant MSW.  Specifically, the Court granted judgment for Mr. Prichard against MSW in the amount $2,616,454.19, including all outstanding principal, interest and fees, with interest and fees accruing at the rate of $1,134.24 per day.  The deadline to appeal the judgment was July 9, 2015.  On July 2, 2015, the Debtors filed a notice of appeal.  The Debtors intend to file a suggestion of bankruptcy in the Fulton County Superior Court and the appellate court.

30.    In Mr. Johnson's lawsuit pending in the United States District Court for the Northern District of Georgia, Atlanta Division (Civil Action No. 2014-CV-252435) (the "Johnson Litigation"), against MSW, MSWLAW, Mr. Hardwick, and the Wittstadts, Mr. Johnson seeks payment of the $3 mil. "loaned" to MSW, plus interest and costs.  It should be noted that, to this day, the Wittstadts, MSW, and MSWLAW have never seen any written loan documents executed by anyone in connection with this "loan."  MSW, MSWLAW, and the Wittstadts anticipate that each will have a claim against Mr. Johnson and his counsel for claims and representations asserted in the Original Complaint and the Amended Complaint.  A motion by MSW, MSWLAW, and the Wittstadts to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure is presently under advisement before the District Court.

31.    As result of the loss of business directly and proximately caused by Mr. Hardwick's actions, on or about August 25, 2014, MSWLAW was forced to enter into a contribution agreement whereby MSWLAW transferred 70% of its interest in Landcastle Title,

LLC ("Landcastle Title")[5] to Landcastle Acquisition Corp., an affiliate of Fidelity National Financial, Inc. ("FNF").  Landcastle Title was an integral – and profitable – part of the Debtors' business as it served as the title agent that issued the title insurance for the Debtors' closing businesses.  Additionally, Landcastle Title served as a title abstracting company used by MSW to get its title abstracts to use for closings.  Prior to being sold, Landcastle was earning approximately $300,000 per month.

32.    Faced with the need to cover a shortfall from the firm's escrow accounts caused by Mr. Harwick's so-called "over disbursements," in exchange for 70% of its interest in Landcastle Title, MSWLAW received, among other things, $1, plus FNF's assumption of the obligation to cover any and all shortfall in escrow accounts (which was estimated to be approximately $28 mil.).  Additionally, on the effective date of the transaction, MSW agreed to loan $1,500,000 to Landcastle Title, and MSW agreed to assume $1,300,000 of the obligations on account of a loan to Mr. Hardwick which was to be repaid to FNF in sixty monthly installments.  Significantly, as part of the transaction, FNF obtained all rights to assert certain claims against and collect upon any judgment against Mr. Hardwick and others resulting from any shortfalls from the escrow accounts and unauthorized withdrawals and distributions to Mr. Hardwick.[6]

33.    As much as the loss of revenue immediately and irreparably harmed the Debtors, the public perception of the firm was also significantly stunted, particularly given the publicity of the lawsuits by Mr. Prichard and Mr. Johnson, and the transaction with FNF.  Given the

---

[5]    The remaining 30% was subsequently transferred to Landcastle Acquisition Corp. on or about April 1, 2015.

[6]    On August 25, 2014, MSW and Landcastle Title, LLC (also naming Morris | Hardwick | Schneider | LLC, MSW's predecessor as a plaintiff) filed a complaint in the Superior Court of Fulton County, Georgia against Mr. Hardwick, Divot, and John Doe 1-10 (Civil Case No. 2014-CV-250583).

Hobson's choice of the loss of the profitable Landcastle business or the immediate need to cover a shortfall of more than $20 mil. of trust funds missing, MSWLAW chose to part with a significant asset.

34.    Mr. Hardwick's unauthorized disbursements from trust accounts were devastating to the firm, however it was not a death sentence.  FNF publicly backed the escrow accounts, the perpetrator of the defalcation was removed from the firm, and the firm was able to convince many of its clients that the firm would be able to survive and thrive again.  While many of the firm's largest customers were, for a time, willing to continue to allow the firm to retain certain files (and even provide the firm with new matters), the publicity surrounding Mr. Johnson's lawsuit and the false statements made by his counsel alleging criminal conduct by the Wittstadts were too much for even an otherwise successful firm like MSW to bear.  The false allegations made by Mr. Johnson and his attorneys led a number of MSW (and the Wittstadts') clients to contact them and advise that they could not do business with MSW anymore and would be terminating the relationship and transferring their files to new counsel unless MSW found a new firm with which to merge before December 31, 2014.  Accordingly, MSW quickly sought to merge with another firm that also did foreclosure work on a national platform.

35.    Concerned about its employees, on or about January 28, 2015, MSW entered into an agreement for the sale of its foreclosure, bankruptcy and eviction operations to Butler & Hosch, P.A. ("B&H"), including the assumption of MSW's lease obligations, in exchange for an unsecured promissory note of $2,072,167.24.  As part of the merger, the client files were turned over to B&H, and the majority of the attorneys who formerly worked for MSW became employees of B&H.  Unfortunately, almost immediately after the agreement was signed, but

before the transition period had ended, I learned that B&H had created false invoices for reviewing each file to be transitioned from MSW to B&H, which B&H surreptitiously used for the purposes of factoring through its secured lender to obtain loans. On May 14, 2015, B&H, together with fifteen of its related entities filed an assignment for the benefit of creditors (the "B&H ABC").

### B.   Pending Litigation against the Debtors

36.     In addition to the Pritchard Litigation and Johnson Litigation, the Debtors are also subject to other litigation, including an action alleging malpractice brought by Branch Banking and Trust Company against MSW and Frederick Boynton, a former partner in MSW, which is pending in the Superior Court Superior Court of Fulton County, 2013-CV-227976.

37.     Additionally, MSW and its principals are significant claimants against Butler & Hosch, P.A. in an assignment for the benefit of creditors pending the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, Civil Division (Case No. 2015-CA-004488-O) (the "Butler & Hosch ABC"), including a motion that was filed by the Assignee

38.     The Assignee appointed in the B&H ABC, Michael Moecker (the "Assignee"), has since filed a motion (the "B&H Turnover Motion") in the B&H ABC seeking to compel MSW, the Wittstadts, and Lee Jones, MSW's information technology officer, to turn over certain assets and records – which is disputed.  Additionally, separate suits have been filed in Maryland against the Debtors (and in one instance, against Debtors' principals and a key employee) to turn over funds that are being held by MSW.  Late on Thursday, July 2, 2015, counsel for the Assignee in the B&H ABC, advised that he would be withdrawing the B&H Turnover Motion; however there remain multiple parties who have asserted a right to the same money and assets. MSW believes that turning over assets to any single party would expose the Debtors, and

possibly their principals, member, and managers, to further legal exposure. Further, MSW believes that some, if not all, of the funds presently being held by MSW are assets of MSW (or its customers).

39.     These lawsuits have exacerbated the need for the Debtors to seek relief under Chapter 11 in order to obtain breathing space necessary to maximize the estates' assets, including potential claims and causes of action.

## III.   SUMMARY OF THE FIRST DAY PLEADINGS

40.     Concurrently with the filing of these chapter 11 cases, the Debtors have filed the following First Day Pleadings:

a.     Motion of Debtors and Debtors in Possession for an Order Directing Joint Administration of their Related Chapter 11 Cases;

b.     Motion of Debtors and Debtors in Possession to Retain UpShot Services, LLC as Claims, Noticing and Balloting Agent;

c.     Motion of Debtors and Debtors in Possession for Entry of an Order Approving the Form and Manner of Notice of Commencement of the Chapter 11 Cases;

d.     Motion of the Debtors and Debtors in Possession For Entry of an Order Authorizing Debtors to (I) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (II) File a Consolidated List of Debtors' 30 Largest Unsecured Creditors;

e.     Motion of the Debtors and Debtors in Possession for Entry of an Order (I) Extending the Time to File Schedules and Statements of Financial Affairs and (II) Extending the Time to Schedule the Meeting of Creditors;

f.     Motion of the Debtors and Debtors in Possession for Entry of an Order Establishing Certain Notice, Case Management and Administrative Procedures;

g.     Motion of the Debtors and Debtors in Possession for Entry of an Order (I) Authorizing Debtors to Maintain Existing Bank Accounts and Business Forms and Continue to Use Existing Cash Management System; (II) Waiving the Requirements of Section 345(b) of the Bankruptcy Code and (III) Directing Applicable Financial Institutions to Honor and Process Checks and Transfers for Trust Funds;

16

h.    Motion of Debtors and Debtors in Possession for Entry of an Order (I) Authorizing Debtors To Pay Prepetition Wages, Salaries and Benefits; and (II) Authorizing Debtors to Continue Employee Benefit Programs in the Ordinary Course of Business;

i.    Motion of Debtors and Debtors in Possession for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (II) Deeming Utility Companies Adequately Assured of Future Performance and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance;

j.    Motion of Debtors and Debtors in Possession for Entry of an Order Authorizing (I) Debtors to Continue and Renew Their Liability, Property, Casualty and Other Insurance Programs and Honor All Obligations in Respect Thereof and (II) Financial Institutions to Honor and Process Related Checks and Transfers;

k.    Motion of Debtors and Debtors in Possession for Entry of an Order Authorizing (I) Debtors to Pay Certain Prepetition Taxes and Fees and (II) Financial Institutions to Honor and Process Related Checks And Transfers;

l.    Motion of Debtors and Debtors in Possession for Entry of an Order Extending the Automatic Stay to Officers and Directors of the Debtors;

m.    Motion of Debtors and Debtors in Possession for Entry of an Order Rejecting Certain Leases of Nonresidential Property nunc pro tunc to the Petition Date; and

n.    Motion of Debtors and Debtors in Possession (I) Pursuant to 11 U.S.C. §§ 105, 364(a), and 507 Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Unsecured Priority Claim Status, (II) Scheduling a Final Hearing; and (III) Granting Related Relief

41.    I have reviewed each of the First Day Pleadings and I believe that the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings. In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to maintain their businesses as a going concern, and otherwise conduct these cases efficiently, permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

42.    Several of the First Day Pleadings request authority to pay prepetition claims. I am told by the Debtors' advisors that Bankruptcy Rule 6003 provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein.

### A.    Joint Administration Motion

43.    The Debtors seek entry of an order directing joint administration of their chapter 11 cases for procedural purposes only. The seven Debtors in these chapter 11 cases include Morris | Schneider | Wittstadt Va., PLLC, Morris | Schneider | Wittstadt, PLLC, Wittstadt Title & Escrow Company, L.L.C., Morris | Schneider | Wittstadt, LLC, MSWLAW, Inc., Teays Valley Trustees, LLC, and York Trustee Services, LLC.

44.    Given the integrated nature of the Debtors' operations, I believe that joint administration of these chapter 11 cases would provide significant administrative convenience without harming the substantive rights of any parties in interest. Many of the motions, hearings, and orders in these cases will affect each Debtor, and joint administration would eliminate the need for duplicate pleadings and orders in each of the respective dockets. This, in turn, would save the Court, the Debtors, and any parties in interest substantial time and expense when preparing and filing such documents. Furthermore, joint administration would protect any parties

in interest by ensuring that they will be apprised of the various motions filed with the Court with respect to each Debtor.

45.     Because the Debtors seek only administrative, not substantive, consolidation of the estates, I do not believe joint administration would adversely affect the Debtors' respective constituencies. The relief requested in the Joint Administration Motion will not only preserve individual creditors' rights, but also provide those creditors the benefit of cost reductions associated with joint administration.

46.     Accordingly, on behalf of the Debtors, I respectfully submit that the joint administration motion should be granted.

**B.     Motion to Approve the Form and Manner of Notice of Commencement of the Chapter 11 Cases**

47.     The Debtors seek entry of an order approving the Debtors' proposed form and manner of the notice of commencement of the Debtors' chapter 11 cases.

48.     I believe that the relief requested in the Notice of Commencement Motion will provide adequate notice of these cases to the Debtors' creditors and all other parties in interest and is critical to achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Notice of Commencement Motion should be granted.

**C.     Application to Retain UpShot Services LLC as Claims, Noticing and Balloting Agent**

49.     The Debtors seek entry of an order authorizing the employment and retention of UpShot Services LLC ("Upshot") as the claims, noticing and balloting agent, effective *nunc pro tunc* to the Petition Date. I understand that the Debtors and their advisors obtained and reviewed

19

engagement proposals from six claims, noticing and balloting agents to ensure selection through a competitive process.

50.     Following that review, and in consideration of the number of anticipated notice parties, the nature of the Debtors' business, and UpShot's competitive and reasonable rates given their quality of services and expertise, the Debtors selected UpShot to act as the Debtors' claims, noticing and balloting agent. I believe that the retention of UpShot as claims, noticing and balloting agent is necessary and in the best interest of the estates. Indeed, UpShot will relieve the Debtors of the burdens associated with claims and noticing services, allowing them to devote their full attention and resources to maximize value for their stakeholders and facilitate the orderly administration of these chapter 11 cases.   Further, were the Debtors not to obtain a claims, noticing and balloting agent, the costs to the estates for services to rendered by UpShot would likely increase as much of those services would be handled by the Debtors' proposed counsel who would charge the estates more than UpShot.

51.     I have also reviewed UpShot's engagement letter and the description of the services that UpShot has agreed to render and the compensation and other terms of the engagement as provided in the application.   Based on that review, on behalf of the Debtors, I respectfully submit that the Debtors' estates, creditors, parties in interest, and this Court will benefit as a result of UpShot's experience and cost-effective methods, and the application to retain UpShot as claims, noticing and balloting agent should be granted.

**D.     Motion to Approve a List of Creditors and Consolidated List of 30 Largest Creditors**

52.     The Debtors seek entry of an order authorizing the Debtors to: (a) prepare a list of creditors in lieu of submitting a formatted mailing matrix as required by Rule 1007-1 of the

Local Bankruptcy Rules and (b) file a consolidated list of the Debtors' 30 largest unsecured creditors.

53.     I believe that the relief requested in the Consolidated Creditors List Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Consolidated Creditors List Motion should be granted.

**E.      Motion to Establishing Certain Notice, Case Management and Administrative Procedures**

54.     The Debtors seek entry of an order to implement certain procedures in connection with the administration of the chapter 11 cases, including procedures to: (i) establish requirements for the filing and service of notices, motions, applications, documents filed in support thereof and objections and responses thereto; (ii) delineate standards for notices of hearing and agendas, (iii) articulate mandatory guidelines for the scheduling of hearings (including periodic omnibus hearings), objection deadlines, reply deadlines and evidentiary hearings, (iv) limit matters that are required to be heard by the Court; (v) authorize electronic service of documents and (vi) authorize the Debtors to establish a website (to provide interested parties with access to certain documents filed in these chapter 11 cases).

55.     The Debtors believe that the requested relief will maximize the efficiency of the administration of these chapter 11 cases and reduce the costs associated with traditional case management procedures. The Debtors also believe that granting the relief requested will limit the administrative burdens and costs associated with preparing for hearings and serving and mailing

documents. Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be granted.

**F.    Motion to Extend Time to File Schedules and Statements of Financial Affairs and to Schedule the Meeting of Creditors**

56.    The Debtors seek additional time to file their schedules and statements of financial affairs and additional time to schedule the meeting of creditors.  Due to the complexity of their operations, and the significant reduction of personnel, the Debtors do not anticipate that they will be able to timely complete the schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and statements of financial affairs in the fourteen days provided under Bankruptcy Rule 1007(c).  To facilitate this extension, the Debtors also seek entry of an order authorizing the U.S. Trustee to schedule the Section 341 meeting after the 40-day deadline imposed by Bankruptcy Rule 2003(a).

57.    Given the immediate issues that the Debtors' limited personnel must address in the early days of these chapter 11 cases, I believe that with the extension requested, the Debtors will be able to focus their attention to business operations to maximize the value of the Debtors' estates during the first critical post-petition months. I believe this will help the Debtors to file full and complete schedules and statements of financial affairs.

58.    Accordingly, on behalf of the Debtors, I respectfully submit that the Motion requesting extension to file the Schedules and statements of financial affairs and scheduling the meeting of creditors should be granted.

G.    **Motion to (I) Maintain Existing Bank Accounts and Business Forms and Use Existing Cash Management System; (II) Waive the Requirements of Section 345(b) of the Bankruptcy Code and (III) Direct Applicable Financial Institutions to Honor and Process Checks and Transfers for Trust Funds**

59.    The Debtors seek entry of an order authorizing the Debtors to (a) maintain the existing Bank Accounts and business forms and continue to use their existing Cash Management System, and (b) waiving the requirements of section 345(b) of the Bankruptcy Code. Without the requested relief, the Debtors may suffer undue disruption to the Debtors' business operations.

60.    The Debtors further seek to direct financial institutions to honor and process prepetition checks and transfers from the trust accounts.  As noted herein, the money held in the trust accounts are not property of the Debtors' estates but money of third parties.

61.    I believe that the relief requested by this motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

H.    **Motion to Authorizing the Debtors To Pay Prepetition Wages, Salaries and Benefits, and Continue Employee Benefit Programs**

62.    The Debtors seek entry of an order (a) authorizing, but not requiring, them to pay the Prepetition Wages and Benefits, and (b) authorizing the Debtors to continue and pay certain associated amounts, including costs and expenses, under the Debtors' Employee Benefit Programs.  Notably, and in conjunction with the motion to allow debtor-in-possession financing, the Debtors seek authority to pay the prepetition salaries of not just their current employees but their former non-attorney employees.  Only current employees will receive the benefit of the Debtors' ongoing Employee Benefit Programs.  The Debtors believe that the total cost for the

23

current Employees' compensation, including related expenses, will be less than $100,000 and the total cost for the compensation, including related expenses, of the former non-attorney employees will be less than $200,000. The cost of the compensation and related expenses for the former non-attorney employees will be paid by an unsecured loan from a two former members and managers of MSW. None of the employees or former employees will receive any compensation exceeding the statutory cap of $12,475 priority cap under section 507(a)(4) of the Bankruptcy Code.

63.      If the requested relief is not granted, the Debtors' relationships with their current and former employees would be adversely impacted and there could well be irreparable harm to the Employees' morale, dedication, confidence and cooperation. Like most law firms, the most important asset of their business is their employees, and the Employees' support for the Debtors' efforts is critical to the success of these chapter 11 cases. The Debtors believe that if they failed to pay or provide benefits to their employees, the Debtors' employees would likely leave, and thereby causing substantial and irreparable harm to the Debtors.

64.      I believe that the relief requested in the Employee Wages and Benefits Motion is in the best interests of the Debtors' estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wage and Benefit Motion should be granted.

I.       **Motion to Prohibiting Utilities from Altering, Refusing or Discontinuing Service, Deeming Utility Companies Adequately Assured of Future Performance, and Establishing Procedures for Determining Additional Adequate Assurance**

65.      The Debtors seek entry of interim and final orders (i) prohibiting utility companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors solely on the basis of the commencement of these chapter 11 cases, a debt owed by the

Debtors for services rendered prior to the Petition Date, or any perceived inadequacy of the Debtors' proposed adequate assurance of payment to utility companies for post-petition services; (ii) approving the Debtors' proposed adequate assurance of payment to utility companies for post-petition services and (iii) approving procedures for resolving objections to the Debtors' proposed adequate assurance.

66.    In the ordinary course of business, the Debtors incur utility expenses for electricity, gas, water, telephone and internet services, including mobile and satellite communications services, and other similar services from a number of utility companies.

67.    I anticipate that the Debtors will have sufficient cash on hand to timely pay in full, and in cash, all undisputed post-petition obligations owed to utility companies during these chapter 11 cases.  Subject to further evaluation of the average cost for each utility, the Debtors intend to establish a reserve of $8,250 in escrow for the utilities at the Debtors' four remaining locations. Nevertheless, I have reviewed the proposed adequate assurance procedures and believe that those procedures provide the utility companies with adequate assurance of payment, and I do not believe that other or further assurance of payment to utility companies for post-petition utility services is necessary. However, I understand that the Debtors have also proposed procedures to resolve requests for additional or alternative assurance of payment in an orderly and fair manner.

68.    Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of these cases. Indeed, any interruption in utility services, even for a brief period, would disrupt the Debtors' ability to continue operations. Given the Debtors' need to receive uninterrupted utility services, the relief requested fairly balances utility companies' rights and the Debtors' rights under the Bankruptcy Code. I do not

believe that the utility companies will be prejudiced by either the proposed adequate assurance or the requirement to provide the Debtors with uninterrupted service.

69.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates.    Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

**J.    Motion to Authorize the Debtors to Continue and Renew Their Liability, Property, Casualty and Other Insurance Programs**

70.    The Debtors seek entry of an order authorizing the Debtors to maintain, continue and renew, in their sole discretion, the Insurance Programs on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date. This relief requested in the Insurance Motion includes (a) paying all of the Debtors' insurance obligations, whether due and payable before or after the Petition Date and (b) renewing or obtaining new insurance policies as needed in the ordinary course of business.

71.    In the ordinary course of business, the Debtors maintain casualty, property, malpractice and other insurance and reinsurance and risk control programs in the ordinary course of their businesses through several private insurance carriers.    The Debtors currently owe one premium financer approximately $21,325.91 on account of a prepetition obligation in connection with the insurance programs.    The Debtors do not believe that any further prepetition claims on account of any insurance programs are due at this time.

72.    If the requested relief is not granted and the insurance programs lapse or terminate, the Debtors may well be unable to continue large portions of their operations, including in some jurisdictions, continuing to practice law without malpractice insurance.    The continuation of insurance is thereby necessary to maintain the value of the Debtors' assets.

26

73.    I believe that the relief requested in the insurance programs is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and is necessary for the Debtors to continue their operations and a lapse in insurance coverage would expose the estates to serious liabilities. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted

**K.    Motion of Debtors and Debtors in Possession for Entry of an Order Authorizing (I) Debtors to Pay Certain Prepetition Taxes and Fees**

74.    The Debtors seek entry of interim and final orders authorizing payment in full, of all tax liabilities, including, sales and use taxes, excise taxes, property, and stamp taxes, taxes on business entity fees, regulatory fees, and licensing fees, and taxes due to the relevant federal, provincial, state, and local authorities, including any related penalties and interest that accrued prior to the Petition Date and that will become payable during these chapter 11 cases.

75.    Based on discussions with the Debtors' finance personnel, the Debtors estimate that there are no Prepetition Taxes that are currently outstanding or that will become due and payable following the Petition Date, which the Debtors are seeking authority to pay during the first 21 days of these cases. The Debtors request authority to pay these Prepetition Taxes, and on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

**L.    Motion of Debtors and Debtors in Possession for Entry of an Order Extending the Automatic Stay to Officers, Managers and an Employee of the Debtors**

76.    The Debtors seek entry of interim and final orders extending the automatic stay to certain officers, managers and an employee of the Debtors who have been named as defendants in other litigation where the basis for claim against the individuals are solely either their relationship to assets of the estates or an identity of interests with the Debtors. Specifically, in

three of the actions, the officers, directors and employee were named solely in order to require that they turn over cash or other assets of the Debtors which are in dispute. In the fourth action (the "Johnson Litigation"), two of the Debtor's officers and managers were named as defendants in a lawsuit regarding an alleged guarantee to which neither had any knowledge at the time the transaction putatively occurred.

77.    To allow the litigation against the officers, managers and employee to proceed would have an adverse effect upon the estates. First, there are the "unusual circumstances" caused by the commonality among the Debtor and the individual defenses. Second, requiring that the officers, managers and employee to continue with litigation in other for a would cause significant distress to the Debtors, particularly where Debtors are short-handed immediately after the majority of their employees left, and while the Debtors are transitioning to Chapter 11.

78.    I believe that the relief requested in the Motion to Extend the Automatic Stay is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and is necessary for the Debtors to continue their operations. Accordingly, on behalf of the Debtors, I respectfully submit that the motion to Extend the Automatic Stay should be granted on an interim basis.

**M.    Motion to Reject Certain Leases of Nonresidential Property *nunc pro tunc* to the Petition Date and Abandon Assets**

79.    The Debtors seek entry of an order rejecting thirty-nine leases, *nunc pro tunc* to the Petition Date, and abandoning the assets at those locations. As noted herein, the Debtors had, at one point as many as 850 employees, operating out of as many as 50 offices. In the last year, the size of the firm has been reduced significantly. Throughout that period, the Debtors have sought to terminate as many leases by agreement as possible.

80.    As of July 2, 2015, the Debtors were reduced to 128 employees, including 33 attorneys and 95 staff members.  In the weeks immediately prior to the bankruptcy filing, the overwhelming majority of the attorneys and staff announced that that they were voluntarily leaving for other jobs, effective July 2, 2015.  As of the Petition Date, the Debtors have 36 employees including 5 attorneys and 31 staff members, and will be operating out of only four offices.

81.    In an effort to minimize expenses as expeditiously as possible, the Debtors have evaluated their existing leases, and have made a determination as to which premises are unnecessary to their reorganizational effort, and by the Rejection Motion, the Debtors seek to reject those Leases which are a burden to the estates.  Further, the Debtors seek to abandon all personal property located at those leaseholds immediately.  The Debtors have determined that the Leases are a burden, not an asset, to the estates, and the de minimis value of the personal property is less than to the administrative costs of maintaining the leaseholds through the costs of a sale.

82.    I believe that the relief requested in the Motion to Reject Leases and Abandon Property is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and is necessary for the Debtors to continue their operations with minimal administrative expenses. Accordingly, on behalf of the Debtors, I respectfully submit that the motion to Motion to Reject Leases and Abandon Property should be granted *nunc pro tunc* to the Petition Date.

**N.    Motion to Authorizing the Debtors to Obtain Post-Petition Financing**

83.    By this Motion, the Debtors seek to allow Messrs. Morris and Schneider, two of former partners of MSW and former members of MSWLAW to loan up to $200,000 to MSW for the sole purpose of enabling MSW to pay the Debtors' former non-attorney employees' wages

and related expenses.  Simply stated, the proposed loan is neither an equity infusion nor a secured loan.  Further, the former partners are not going to receive any interest on account of the loan.

84.    This proposed loan is a genuine act of benevolence to benefit the Debtors' former non-attorney employees who were the backbone of the firm, and the former partners agreed, in essence, to swap the former employees' claims for wages, salary and commissions which are entitled to a priority under Section 507(a)(4) in exchange for an unsecured claim which receives the same priority.  Further, Messrs. Morris and Schneider will receive a distribution on account of their Section 507(a)(4) claim at the same time as other holders as other unsecured claims in the MSW bankruptcy case.

85.    As a result of the proposed loan, MSW's former rank-and-file employees, some of whom the Debtors understand live paycheck to paycheck, will not have to wait until the conclusion of these cases in order to receive a distribution on account of their uncontested claims for wages.  The Debtors respectfully submit that allowing the proposed loan is in the best interests of the estates and requests entry of interim and final orders authorizing MSW to (a) obtain such post-petition financing, and (b) grant to Messrs. Morris and Schneider an allowed unsecured claim in the MSW bankruptcy case with a priority under Section 507(a)(4) of the Bankruptcy Code in an amount equal to the loan amount used to pay MSW's former non-attorney employees' wages and related expenses.

86.    I believe that the relief requested in the Debtor-in-Possession Finance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Debtor-in-Possession Finance Motion should be granted on an interim basis.

## IV.  CONCLUSION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: July 5, 2015
      Baltimore, MD

                        Mark Wittstadt, Esquire
                        Executive Managing Partner of
                        Morris | Schneider | Wittstadt, LLC

7916408/5

31